At the risk of wasting a few of my seconds here, I have to admit that this is unique for me, and I'm glad to be back, Your Honor, if it may please the Court. Welcome back. Thank you. Your Honor, every time a deputy failed to check for signs of life or of distress at a cell, there was a constitutional violation. The trial court said, look, there are no questions here that they're tribal questions, in fact, as to the reasonableness of the safety checks. Now, there were 18 cells in this unit. The video footage that we've submitted shows that they regularly walked by the deputies and with a hand scanner would just click, click, click. There wasn't that required very base level, minimal... Let's say that I'm intrigued by this argument. I've looked at the evidence. You know, it does indicate that there was some superficial kind of checking of the cells, but I'm curious to know how you distinguish this case from Gordon, which is a case from our circuit that seems very similar factually in how we get around the holding in that case that the evidence presented, which is similar to what you have here, is merely a single incident of unconstitutional activity, which doesn't rise to the level of allowing for a Menil liability. And thank you, Your Honor. Probably the most significant difference is that we have more than one constitutional violation here, Your Honor. And if my math is correct, what's presented in the video evidence is that there are 364 repeated examples of the constitutional violation. The constitutional violation is the failure to do a proper safety check. And not only did they do it with respect to Mr. Nyrecha, but they did it with respect to all of the other 18 cells. They did it to... Is there evidence in the record about that with respect to other cells with other officers, not just in this case? Yes. Can you point me specifically to where in the record we can find that evidence? Well, in this case, Your Honor, the evidence is that multiple different officers during two shifts, okay, and during two separate calendar days engaged in a regular practice. There's no doubt, as reflected by the examples that we have there, that that's the way they did it. So we can definitely see from the video many cells and many officers over this... It was two shifts, but it was one night, right? Yes. So do we have any information about whether this night was typical? Like, do we know if half the officers were out sick that night or something? I mean, do we know anything about whether this was a typical night? No, we don't know, Your Honor. And I'd respectfully submit that the evidence shows that over two separate shifts, and if my memory serves me correctly, there were at least eight different deputies that one could tell visually engaging in the identical conduct. And I want to... Was there... I think there was a mention in the briefs about there not being discovery. Did you try to get discovery about other nights to see whether this was the same pattern on other nights? No, we did not, Your Honor. And I want to narrow the question to this particular unit, and whether or not there is a custom and practice that my esteemed colleague, I think, would assert that, look, you know, this is a very isolated incident in a very narrowly kind of construed circumstance. Your Honor, what we do know is that that was the practice, the common typical practice in this unit, okay? And most city jails, as the Court probably knows, rarely have 18 different cells. And if we looked at this as a local jail in, you know, some town in South Dakota, respectfully, one would have to say, oh, my God, this is the way they do it. So here the safety check supervisor actually opined that the way that they did those checks, shown on the video, was proper and correct. And does that show that it's their custom or policy on how they do their safety checks? And I did depose that individual myself, Your Honor, and my recollection of his testimony was that he was very focused as to how it was supposed to be done, Your Honor. And the requirement was that they vary at the, again, most basic level just to make sure they're breathing. They want to make sure that they're alive. And, you know, this happened over the nighttime period, and most of them were asleep. But even then, you have to actually look to make sure that they're breathing. Now, keep in mind, they eventually found Mr. Nyreka in rigor mortis. He had been dead for a long time. And there's evidence in the record from our expert that's saying that, look, that his death because of the Seroquel would have been detected by looking for breathing because at the late stage of that toxicity, the breathing was so narrow and so shallow that anybody looking for breathing would say, the guy's not breathing. And your complaint alleged that he missed both dinner the evening before and breakfast that morning. Yes. And from looking at the video, it looked to me like he never left the cell from the parts that are spliced on the video. What we have from the video footage, Your Honor, is basically that he is essentially, and in working with the video, it does appear that he essentially remains in his cot. And, again, whether or not he was breathing, we do know that at some point, if the medical evidence here is accepted, his breathing, and this would have happened within an hour, his breathing became so shallow before he died that that would have been detected if somebody was looking for the breathing, Your Honor. And Sergeant Kellum, who was the supervisor, basically said that they were looking for the breathing, but I think your point is, when you watch the video, that can't be true? That is exactly our point, Your Honor, and I... Or, sorry, should we understand Kellum to be saying the way this was done, where they really weren't looking, is the proper thing? Mr. Kellum's testimony was that, at the very bare minimum, they have to stop in front of the cell and confirm some sign of life. That is the term of art that they use. But didn't Kellum look at the video and say, this all seems fine? Or what happened with that? Didn't he say, this looks like they did it right? I don't have a specific recollection of that, Your Honor. I do recall that he did not have a problem with it, Your Honor, and I respectfully submit that if Mr. Kellum says doing it that way is right, then Mr. Kellum is wrong. Because, again, it's rampant, respectfully. They literally walk by and sometimes don't even look. They're just looking at the barcode on the wall. They want to record that they did a safety check without doing a safety check. And at the bare minimum, Your Honor, if we only focus on Mr. Nyreka's cell, we have at least 26 examples. I'd submit that it happened with respect to all of the cells. But, again, we have evidence of there being a custom and practice of doing them this way, in a substandard way, in this unit. Is there any evidence that any of the officers that looked into the cells were reprimanded or disciplined in any way? No. We know that they weren't, Your Honor. How do you know that they weren't? I couldn't find that in the record. There is no evidence of that in the record, and I apologize to the Court. My recollection in their deposition is that none of them were disciplined. I'd submit on that, and I imagine that that would be confirmed. And they submitted affidavits indicating that they were still functioning in their role? There were affidavits indicating that they continue to be deputies. And, Your Honor, I have about five minutes that I would like to reserve for rebuttal. Thank you. Good morning. May it please the Court. Ilana Rotter for the defendants. I'd like to first just to put one thing to the side. The judgment was qualified immunity for the individual deputies and then on the Monell issue separately for the county. I just want to note that there's been no challenge on appeal as to the deputies, so whatever would happen as to Monell, there would be no basis to reverse as to the individuals. On the Monell claim, the point of the Monell custom and practice prong is to require that the custom be so longstanding and pervasive in duration and well settled that it can be fairly said to be the official policy. The officer's deposition testimony indicates when watching that video that, yeah, this is how it's done. This is what we do. Isn't that enough to establish that pattern and practice? I would say that's not an argument that's been developed. The appellants have been very clear that their theory is that the video is enough and that the question is whether 13 hours of video establishes the sufficiency of duration and pervasiveness. That's the only theory that was briefed. As I understand the argument, it's that this case is distinguishable from the circuit's precedent because this isn't just an isolated incident of unconstitutional activity. We have the video that shows these two shifts over the course of two days, the fact that there's evidence that he didn't show up for certain meals, and then we have testimony in the record. I'm not sure that this is all part of the same theory, which is that there is a pattern in practice. That's the theory, and then the evidence in the record are all of these things that I just mentioned. Why doesn't that together make this case different than Gordon? I will say, first of all, again, it's not the theory that was briefed. If I'm looking at ER 196, which is the plaintiff's opposition to summary judgment, the repeated failure to conduct safety checks as documented in the video footage is the policy. It's emphasizing very strongly the videos. If you look at both the open brief and the reply brief, the theory articulated is the videos. There's not a reliance on that testimony by the supervisor or by the missed breakfast and dinner. Those are not even really mentioned in the briefs. We generally hold appellants to the theory that they have chosen to articulate. This was an order from the district court granting summary judgment, right? So we can affirm or reverse on any grounds on a summary judgment order, correct? Sure, but typically still framed by the arguments that the parties themselves have advocated as opposed to other ones that have not been. Did you have any other arguments for why this case is more like Gordon as opposed to not like Gordon? Sure, I would say it's like Gordon in the sense of this is essentially a single incident because the question again is whether this policy can be attributable to the defendants. We're not looking at a respondeat superior situation where a few deputies or even a supervisor are having something not go correctly on a night over the course of two shifts is then municipal policy. I mean, that's where we'd have to get to is what is the municipal policy. How do you explain how so many officers at so many cells would do exactly the same thing that we see over and over and over on the video unless it's the standard practice? Again, the possibility is a particular lax supervisor or a particular, as your Honor suggested earlier, do we know what was happening on this night was representative of other nights? We don't. But it was two shifts, so you're talking about at least two supervisors. Sure. So it's not just one lax supervisor. Two lax supervisors. But the question again is, is this policy so longstanding and pervasive that we can say it is the policy that the sheriff's department and the county have adopted for bed checks? And the number of cases emphasizing the permanent and well-settled standard is very high. Even an appellant's brief is recognizing that as the standard. We have this coming from Thompson, Gordon, Trevino, Hunter. There are many, many cases that repeatedly the descriptions are permanent and well-settled, longstanding, sufficient duration, frequency, and consistency such that the conduct has become the traditional method of carrying out the policy, persistent and widespread. And the idea is to restrict this to situations, again, to prevent respondeat superior liability and to make sure that this is truly the custom that the sheriff's department has adopted. And I would say in this case particularly, we have agreement that the official policy is correct and that the training is correct. So you say there may be two lax supervisors. Is there any evidence in the record that any of the officers were disciplined? No, but there's also... And if they've got a lax supervisor and they're not following the policy? No, but there's also no evidence that, for example, is the disciplinary standard that something goes wrong on why you impose discipline? What is the process for, you know, would there have been a formal reprimand? Would there have been a discussion? What would have been the proper measures? It's not something that was ever developed. In the same way that there was no discovery taken and no evidence developed about other cells, you know, it would have been easy enough to ask for video of the week before, the month before, a different set of deputies, a different set of supervisors. None of that was even requested here. And that is typically the standard for Monell. The district court didn't find a case, and we have not seen a case, where a shift is enough when you don't have an actual policymaker who's making the decision. You know, that's a separate category of Monell liability, is action by a policymaker. But here we have non-policymakers, and the question is... What about Manatee v. City of Seattle, a Ninth Circuit opinion from 2005, where it happened in one day, five officers involved? So, Manatee was about enforcement of a policy, I believe. We have... What I'm reading here is, although plaintiffs allege that Damask had taught his world politics class for 24 years, they do not allege... Oh, I'm sorry, this is Sabra that I'm looking at here. Manatee is... WTO case. No, I'm sorry, yes. I think, again, Manatee was talking about... I think it was more of a policy case, and I don't... I regret that I... We have not focused on this because it's not really what, again, was briefed. But in Manatee, I see the argument is that the city had adopted a policy of suppressing speech, and then there's a declaration... That it all happened on December 1st, five officers involved on December 1st, one day. So you were asking if there was another Ninth Circuit opinion that happened in one day. Yeah, I still... They were talking about whether it was a policy to apply an order in a particular manner in that case. I still... If the court wants to go there, I would request a chance to brief this because it's not something that was argued and developed in the briefing. I'm looking at it on the fly here, and I really would appreciate the chance to look at it more. Even in the face of the district court having said there is no case on point, appellants did not develop an argument that Manatee was on point. Factually, they cited Manatee in their briefs, I believe, just for the general standard. And I'm just going to flip to where they said in Manatee, which is at page 15 of their brief. And again, the only citation to Manatee in this brief is for the general standard that there are three ways to establish liability. So again, if that's the argument, I would request a chance to look at it in more depth. But again, I still think in the face of all this other case law, indicating that isolated instances are not enough, and the fact that here the question is, again, is this a policy that is so pervasive that we're going to attribute it to the county as having been essentially officially adopted as the way that they want bed checks done. And the two shifts on one night on one cell block is simply not enough. Again, I think this is respondeat superior liability based on potential negligence on a particular night or a deviation from training on a particular night. The question is, is it so pervasive that the policymakers would have known that this is what was happening? And a supervisor is not a policymaker, so we've still got another level up. And the question is, do the policymakers have a reason to know that this is the way that they're happening, that this is happening on a regular basis, that people are departing from their training on a regular basis? Okay, so they show this video that shows many, many officers, many cells over two shifts, two different supervisors doing this exact same conduct. Why isn't that enough to trigger at least some obligation on your part to show that it's not the policy by either saying they were disciplined or saying half the people were sick that night or saying this is unusual for some reason, look at the next night? Why haven't they actually raised a genuine issue of fact, at least in the absence of some response that would distinguish this? The standard that they had to prove was pervasive, well-settled, long-standing custom. Evidence over the course of the one night, we believe under the case law that they had developed, does not meet the standard of well, you know, it is by definition not long-standing. It is by definition no evidence of widespread. Well, it might by inference seem like this must be long-standing because everyone is doing the exact same thing in the absence of some other explanation that it's, I mean, what is the inference other than that this is long-standing when you have this many people doing the exact same thing? So again, we have the evidence of what the official policy is we've put in, and it's undisputed, and we have the evidence of what the official training is, and that's undisputed. It's in both sides' briefs. And then you have this one example which appears to be a deviation from those official things. Inferences have to be reasonable and not speculation. And in this case, in the face of the official policy that is undisputed, the official training that is undisputed, and the narrowness of the evidence here, didn't think they got over the bar for making their case that would shift the burden to be rebutting with this kind of evidence that Your Honor is suggesting because, again, it doesn't seem to get past the threshold of pervasive, long-standing, well-settled. Again, in the lack in the... I agree that one night might not itself be long-standing, but it's very hard for me to imagine how you have this kind of pattern in that one night unless it is long-standing. Like, there is an inference from this. Maybe you can give me some explanation that would be the more intuitive inference, but I don't know what it is. How do you have this many officers doing the exact same thing unless the inference is this is how they always do it? Again, the possibilities are a lax set of officers or a lax supervisor, and the question is not about this one night. Again, I'll go back to the question for Monell purposes. Would the policymakers have known about this? Is it so clear? I agree, I agree, but hopefully they would know about it if this is exactly what happened every single night. Hopefully, if it is not supposed to be what happens every single night, they would have watched this video and disciplined these people, and then you'd have evidence of that. I mean, there are lots of things you might be able to say, but you're not giving us any of them, so we're left with what seems like an inference that this is how it was done, and they should have known. Again, I think in the absence of any evidence from the plaintiffs who have the burden here about how this would have come to the attention of a policymaker, what is the setup for reviewing this video? You're saying, well, how would they not have seen the video? There's no evidence in the record that policymakers, the frequency with which they watch this video, are disciplined. This individual died. I hope they watched the video. I mean, are you telling me they don't watch the video when someone dies? Like, why wouldn't there be discipline or something that happens once this happens, if it's unusual? So, again, the fact that he died, I'm not saying they didn't watch the video in this particular instance. The question is, were they on notice of a pattern such that this could be said to have been adopted as the way that things are always going to be done? I understand, but if the expectation is that you would be more careful than this, then one would think, once they watch this video, that they would have disciplined these officers because they did not look to see whether he was breathing. That's very obvious. So maybe then you'd have evidence, okay, the way I can show that this isn't the longstanding policy is that these people were fired, but apparently they weren't fired. Maybe you could have told us they were reprimanded, but you haven't said that either. So we're left with everyone acted like this was normal, which would suggest that it's longstanding. Again, I think to extrapolate from the response to one incident to leap from there to the well-settled longstanding, I think is perhaps a bridge too far to be a reasonable inference. Again, because this is bordering on liability for allowing this to happen in a particular instance, as opposed to evidence that this is what is intended to happen, what is happening on all the shifts, all the time. Again, in the absence of evidence about how discipline works and how many violations there need to be. And again, this was not the theory... Because it wasn't the theory that was developed, it's not a theory that has been really developed with evidence because it's not the theory that plaintiffs articulated. And we usually, at summary judgment... I know you keep saying that, but the theory in this case, Manel liability, is that even though the written policy is X, the longstanding pattern and practice of the county is to conduct the checks in this way. Here is video evidence to suggest that the checks are done in this way. There's other evidence in the record to suggest that this is typical because the supervisor testifies that, yeah, that's how it's done. And we know in this particular case, the individual wasn't checked for breathing. So I know you keep saying that the theory wasn't developed, but I don't understand what you mean when you say that. Because there's only one theory for Manel liability here, and that is that notwithstanding the written policy, the practice is something else. Thank you, Your Honor. Let me just try to clarify that. The theory, yes, is that the policy is that people are not doing what they're supposed to be doing. But my point is that the way that that theory was demonstrated by the plaintiffs, the way that they chose to try to present their theory, was just the video evidence, not an argument about the lack of discipline, not an argument about the supervisor's deposition. I disagree with you that there could have been even more evidence, that maybe they should have asked for, you know, video of other days or deposed more people. I mean, we can always have a conversation about how, in litigation strategy, you could have done more or less or something different and would have made your case better. But we have the record that we have before us, and if there is enough there to suggest that this was the pattern in practice, then you're not saying that simply because there's a written policy that says something else, we can't find that the pattern and practice of the county is different. Sure. If there had been video of 10 more nights over the course of a couple of months, the fact that there was a written policy wouldn't be sufficient. What's your argument as to when you hit the magic threshold for it to not be a single incident? Is it two? If the plaintiffs had asked for video evidence from two nights, three nights, a week, 10 months, four years, what's... I would say certainly it's more than the one shift that's at issue here, and we don't have to do that by and large. But there's two shifts here. It's not just one shift. Just in a row, so you've got the same night, right, and you've got a couple of supervisors. But this is not, again, for the pervasive and longstanding... And I would compare this, for example, to Hunter, which was cited in the appellant's opening brief. There you've got evidence of 40 to 50 excessive force incidents over the course of five years, which is just a very different situation. So we have to wait five years and have multiple deaths? Not necessarily, but as a contrast, that's the other end of the scale. You're asking sort of where's enough, and there's a scale here from one incident to 40 or 50, but there's a lot of room in between, but one is still on the very end of the scale. I think you've also got Trevino v. Gates, which is cited in the briefing, where the question was... the alleged policy was about indemnifying for punitive damages for deputies. And there they look at the examples. There's, like, you know, 10 different cases, and a couple of them come out this way, but not in every case, and they say this is not, you know, there's not enough here to say longstanding and pervasive. Here we've got one. And it might be tempting to say because we have one, let's treat that as the example, but that is, I think, a dangerous path to go down because then in any Monell case we get to a situation where we've got the one, and now you're going to put the burden in every case on the defense to rebut that the one is ageable. It's just that there's a way to look at this video and think that we have more than 200, not just one, because we see so many of the same behavior. Sure, although I would say you could think of it as 200, but you could think of it as seven or eight deputies. You know, if they're going to do one wrong, okay. So seven or eight deputies have done something not correctly in the course of two shifts. And there aren't any that do it correctly, right? It depends on what you're going to define as correctly. We're on summary judgment, and we've just got a video here. But looking at all the facts in the light, they all appear to do a similar kind of check. But again, I think that is shifting the burden from requiring the plaintiff to put on some kind of affirmative evidence that this is a longstanding customer policy to the defendant to prove it's not, based on a single incident. And typically, that's not the way that Monell cases are working, because it's the plaintiff's burden to prove a customer policy. And if all the plaintiff needs to do is put up the one or two shifts, and that flips the burden, now we're requiring the defense to put on evidence that it is not the customer policy, as opposed to having the plaintiff put on the evidence that it is the customer policy. We have you over your time. Thank you for your argument.  Unless the Court has any specific questions for me, I'd stand submitted. Thank you. Thank you. Thank you, both sides, for the helpful arguments. This case is submitted. And I think we need to take a break before the next case because the courtroom will be sealed.
judges: FRIEDLAND, DESAI, Schreier